# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
      **Plaintiff,**

    **v.**                                                    **Case No. 11-CR-186**

**MICHAEL TOLBERT**
      **Defendant.**

---

## DECISION AND ORDER

The government charged defendant Michael Tolbert with failing to register as a sex offender, 18 U.S.C. § 2250, and possessing firearms and ammunition as a felon, 18 U.S.C. § 922(g)(1).[1] Defendant moved to suppress physical evidence, arguing that the police violated the Fourth Amendment in seizing the firearms and ammunition. The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing, then issued a recommendation that the motion be granted.

The government does not object to the magistrate judge's findings of fact or the recommended suppression of the firearms, but it does object regarding suppression of the ammunition. Defendant supports the recommendation of suppression but objects to one of the magistrate judge's specific factual findings. The district court must review de novo those portions of a magistrate judge's recommendation to which specific objection is made. See Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1); United States v. O'Neill, 27 F. Supp. 2d 1121, 1126

---

[1]The parties agree that these two counts should, if the case proceeds to trial, be severed. Because the charges are not of "same or similar character," "based on the same act or transaction," or "part of a common scheme or plan" under Fed. R. Crim. P. 8(a), defendant's motion to sever will be granted.

(E.D. Wis. 1998). Neither side requests a de novo evidentiary hearing in this case, and I find the record made before the magistrate judge sufficient for me to rule on the motion. See United States v. Raddatz, 447 U.S. 667, 673 (1980).

## I. FACTS

City of Kenosha Police Officer Jack Decker testified that he received a tip that defendant, a convicted sex offender, failed to register after moving to Wisconsin. Decker also had a printout showing that defendant had previously murdered a child. (Oct. 11, 2011 Evid. Hr'g Tr. at 5-6.) Decker checked Kenosha Police Department records and learned that defendant had received a traffic citation driving a vehicle registered to a Rainie Warren at an address on 13th Avenue in Kenosha. (Tr. at 6.)

Decker, along with Kenosha Police Officer Larson, went to Warren's address on the morning of August 12, 2011. (Tr. at 7.) Decker made contact with Warren, explained that he was looking for defendant, who had failed to register as a sex offender, and asked if defendant resided there. (Tr. at 8.) Warren told Decker that defendant had lived at the address since February, that he was there now, and that Decker could come in and search for him. (Tr. at 8.)

After back-up arrived, the officers conducted a search of the residence, locating ten children but not defendant. (Tr. at 9-10.) After concluding that defendant wasn't home, all of the officers except Decker left. (Tr. at 24, 25, 35.) Decker took a written statement from Warren, then asked her for permission to photograph the bedroom she shared with defendant. (Tr. at 10, 43.) Warren agreed. Decker testified that his purpose in taking photographs was to establish defendant's residency at the address; he wasn't looking for other evidence. (Tr. at 10-11, 17.)

2

Warren accompanied Decker into the bedroom, where defendant had stacked clothing, books, and other belongings on the bookshelves. (Tr. at 11, 43; Govt. Ex. A.) Decker estimated the shelves to be seven to eight feet high (Tr. at 26)[2] and indicated that he stands about 6'1" tall (Tr. at 27). After Decker started taking photographs, he noticed a box of ammunition on the second shelf from the top. (Tr. at 11, 28; Govt. Ex. A; Def. Ex. 100.) He moved some things out of the way to get a better view to photograph the ammunition; however, he did not move the ammunition before taking photographs; nor did he move anything in order to see the ammunition initially. (Tr. at 20-21, 29-30.) After taking photographs, Decker took the boxes of ammunition down from the shelf and placed them on the bed. (Tr. at 22.)

Decker then noticed a gray cloth bag next to the ammunition, which he suspected to contain firearms. (Tr. at 13.) Around this time Decker received information that defendant had been contacting dispatch and was going to return to the residence. (Tr. at 13.) Decker decided to check the bag, which felt "heavy and consistent with a gun being there" (Tr. at 13), although it "wasn't readily apparent" to him what was in the bag (Tr. at 22). He took the bag down, set it on the bed, heard a "metal clink," opened it up, and found two pistols inside. (Tr. at 13, 22.) Warren told Decker that she had never seen the firearms before and did not own the guns or ammunition. (Tr. at 15.) Decker took the guns and ammunition into evidence. (Tr. at 16.) Decker denied using a stool to initially spot the ammunition; he testified that he may have used a stool later, but he could not recall for sure having done so. (Tr. at 18, 22, 30.) At no point during the discovery of the ammunition and firearms did Warren seek to limit or withdraw her consent to photograph the bedroom or otherwise object to Decker's actions. (Tr. at 15.)

---

[2]A defense investigator testified that he measured the shelves at eight feet. (Tr. at 61-62.)

At the evidentiary hearing, Warren acknowledged that she gave officers permission to enter her house to look for defendant, and that she permitted Decker to take photographs of defendant's things in their bedroom. (Tr. at 45.) On direct examination, Warren testified that Decker started taking pictures and then saw the ammunition on the shelf. She continued: "After he seen [sic] the ammunition he asked for a stepping stool, and he stepped up on the stool and found the black bag, and he pulled it down off the shelf." (Tr. at 46.) The AUSA clarified:

> Q     So that was after he saw the ammunition that he asked for the stool ?
>
> A     Yes.

(Tr. at 46-47.) Warren testified that she obtained the stool for Decker, he used it to take the bag from the shelf, and then pulled the guns out of the bag. (Tr. at 47.) Warren stated that at no time did she place any limitation on what Decker could do. (Tr. at 48.)

On cross examination, Warren's testimony was less clear. In response to leading questions from defense counsel, Warren testified that Decker obtained the stool from the living room, brought it into the bedroom, stood on it, looked at the shelves, and then saw the ammunition. (Tr. at 50-51.) After he saw the ammunition, Decker grabbed the bag, placed it on the bed, reached inside, and pulled out two guns. (Tr. at 51.) She further testified on cross that Decker was the one who went and got the stool (Tr. at 52), which he used to see the ammunition (Tr. at 54).

However, when asked to clarify on re-direct examination, Warren stated: "I believe he seen the ammunition, then he got the stool." (Tr. at 57.) On re-cross, defense counsel asked:

> Q     And you can't be sure if Officer Decker saw the ammunition before or after
>
>         finding the stool, correct? You're not sure when he saw the ammunition?

4

A       Correct.

(Tr. at 58.)

## II.  THE MAGISTRATE JUDGE'S RECOMMENDATION

Before the magistrate judge, defendant acknowledged that Warren voluntarily gave consent to enter their home to search for him and to photograph the bedroom they shared. However, defendant argued that Decker exceeded the scope of that consent when he used a stool to see the shelf where the boxes of ammunition were located and to photograph those areas not in plain view.  Defendant further argued that the plain view exception did not apply because the ammunition was not incriminating under Wisconsin law, which does not bar felons from possessing ammunition.

The magistrate judge found that Warren's consent was limited to photographing the bedroom, and that it was not reasonable for Decker to assume that the scope of her consent included the ability to feel objects on the bookshelves or move them around.  The magistrate judge thus concluded that any actions beyond photographing the bedroom, such as removing objects from the bookshelves, exceeded the scope of Warren's consent.  The magistrate judge rejected the government's argument that Warren's failure to object to Decker's actions extended the scope of her consent.

Turning to the facts of the case, the magistrate judge found that in the course of photographing the bedroom Decker first observed a box of ammunition and then asked Warren for a stool, which he later used to pull the black bag containing the firearms off the shelf.  She thus implicitly rejected defendant's argument that Decker exceeded the scope of consent (by using the stool to get a better look) when he first viewed the ammunition.  Nevertheless, the magistrate judge concluded that, although Decker was lawfully present at the time he spotted

5

the ammunition, the incriminating character of this evidence was not immediately apparent. The magistrate judge noted that while Wisconsin law prohibits felons from possessing firearms, it does not cover ammunition. The magistrate judge further noted that the government failed to establish that Decker knew it was a federal crime for a felon to possess ammunition. She concluded that: "Ammunition is not automatically contraband that can be seized without a warrant." (Recommendation at 11, citing United States v. Lemons, 153 F. Supp. 2d 948, 959 (E.D. Wis. 2001).) She therefore recommended that the ammunition be suppressed.[3]

## III. DISCUSSION

### A. Positions of the Parties

In their objections, the parties each take issue with one component of the recommendation. The government argues that the magistrate judge erred in concluding that the incriminating nature of the ammunition was not immediately apparent. Decker knew defendant was a convicted felon, making his possession of the bullets illegal under federal law, something a reasonable state officer would likely know; a reasonable officer would also know that possession of ammunition is "linked" to the state crime of possessing a firearm. See United States v. Blom, 242 F.3d 799, 808 (8th Cir. 2001); United States v. Bruce, 109 F.3d 323, 328 (7th Cir. 1997).

Defendant argues that the magistrate judge erred in finding, as a factual matter, that

---

[3]The magistrate judge went on to recommend that the firearms be suppressed, finding that Decker exceeded the scope of Warren's consent in removing and searching the gray bag. She further rejected the notion that Decker could have concluded that the bag obviously contained contraband under the "plain feel" exception to the warrant requirement. Finally, the magistrate judge also rejected the government's inevitable discovery argument regarding the firearms. The government does not object to these conclusions, which appear to be supported by the record and consistent with applicable law. I therefore adopt these portions of the recommendation and suppress the firearms.

6

Decker saw the ammunition before he used the stool. If he was able to see the ammunition only by using the stool, defendant contends, Decker exceeded the scope of Warren's consent to photograph (but not otherwise search) the bedroom. And if so, defendant continues, Decker was not "lawfully present" in the spot from which he saw the bullets. The government believes that the magistrate judge got the facts right, but even if Decker used a stool he did not exceed the scope of Warren's consent.

**B.      Applicable Legal Principles**

**1.      Consent**

Warrantless entries and searches of the home are presumptively unreasonable, subject to a few narrow exceptions. See, e.g., Payton v. New York, 445 U.S. 573, 586 (1980); United States v. Parker, 469 F.3d 1074, 1077 (7th Cir. 2006). One such exception is a search conducted pursuant to a voluntary consent, United States v. Dorsey, 27 F.3d 285, 290 (7th Cir. 1994), which "lifts" the warrant requirement, United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996).

The permissible scope of a consent search is limited by the breadth of the actual consent. United States v. Torres, 32 F.3d 225, 230-31 (7th Cir. 1994). The standard is an objective one – what would a typical reasonable person have understood from the exchange with the police? Florida v. Jimeno, 500 U.S. 248, 251 (1991); United States v. Bernitt, 392 F.3d 873, 877 (7th Cir. 2004). In the usual case, the scope will be confined to the express object of the search, i.e., what the officers were looking to find. Jimeno, 500 U.S. at 251. While the police may not obtain consent on the representation that they intend to look only for specified items and then used that consent to conduct a general search, United States v. Raney, 342

7

F.3d 551, 556 (7th Cir. 2003), the burden of limiting the scope is on the consenting person, Stribling, 94 F.3d at 324. The court may look to the consenting person's conduct in determining the scope of consent, including her silence or failure to object. See, e.g., United States v. Saadeh, 61 F.3d 510, 518-19 (7th Cir. 1995); United States v. Maldonado, 38 F.3d 936, 940 (7th Cir. 1994).

### 2. Plain View

When an officer (1) lawfully present (2) sees something in plain view (3) the incriminating nature of which is immediately apparent, the officer may seize the item without a warrant. Bruce, 109 F.3d at 328. The "lawfully present" requirement means that the officer cannot violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. See Horton v. California, 496 U.S. 128, 136 (1990). The doctrine permits the officer to seize without a warrant the evidence he comes upon after lawfully arriving at the location. See United States v. Brown, 79 F.3d 1499, 1508 (7th Cir. 1996). The "incriminating nature" element means that the officer must have probable cause to believe that the item is linked to criminal activity. Horton, 496 U.S. at 136-37. The doctrine extends not just to items the officer sees but also to things he touches, Minnesota v. Dickerson, 508 U.S. 366, 375-76 (1993), or hears, United States v. Ceballos, 385 F.3d 1120, 1124 (7th Cir. 2004). The government bears the burden of showing that a seizure fits within the plain view exception. United States v. Messino, 871 F. Supp. 1035, 1039 (N.D. Ill. 1995).

## C. Analysis

### 1. Government's Objection

It makes sense logically to start with the government's objection, for if the incriminating

nature of the ammunition was not immediately apparent, I need not resolve the issue of whether Decker used a stool to see it and, if so, whether that action exceeded the scope of Warren's consent. I agree with the government that, under the circumstances of this case, Decker could seize the ammunition as evidence of criminal activity.

First, Decker could have lawfully seized the ammunition as evidence of the crime of felon in possession under 18 U.S.C. § 922(g)(1). The magistrate judge cited my decision in Lemons for the proposition that ammunition cannot automatically be seized without a warrant as contraband. See 153 F. Supp. 2d at 959. However, the problem for the government in Lemons was that the police did not, at the time they seized the bullets, know that the defendant was a felon. Thus, they could not have known that the bullets constituted evidence of the crime of felon in possession under federal law. Id. at 961. In this case, conversely, it is undisputed that Officer Decker knew defendant was a felon at the time he observed the ammunition among defendant's belongings in the bedroom.

The magistrate judge noted that Decker was a state officer investigating possible state offenses, and the government presented no evidence that he knew of the federal ban on felons possessing ammunition; defendant reiterates these points in his response to the government's objection. However, Fourth Amendment standards are objective; the subjective goals or motives of the officer are irrelevant. See, e.g., Whren v. United States, 517 U.S. 806, 808 (1996); United States v. Sanchez, 612 F.3d 1, 6 (1st Cir.), cert. denied, 131 S. Ct. 621 (2010); United States v. Van Dreel, 155 F.3d 902, 905 (7th Cir. 1998). As the Supreme Court explained in Devenpeck v. Alford:

> Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. That is to say, his subjective reason for making the arrest need not be the criminal offense

9

as to which the known facts provide probable cause. As we have repeatedly explained, the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action. [T]he Fourth Amendment's concern with reasonableness allows certain actions to be taken in certain circumstances, whatever the subjective intent. [E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.

543 U.S. 146, 153 (2004) (internal citations and quote marks omitted); see also Virginia v. Moore, 553 U.S. 164 (2008) (holding that police officers do not violate the Fourth Amendment in arresting a person on probable cause, even if that arrest violates state law, because the meaning of the Fourth Amendment does not change based on local practices). In the present case, a reasonable "state police officer who knew [defendant] was a convicted felon would likely know it was a federal crime for him to possess ammunition." Blom, 242 F.3d at 808; see also Messino, 871 F. Supp. at 1039 (stating that the immediate apparency requirement should be evaluated from an objective standard).[4]

Second, Decker could have seized the ammunition as evidence "linked" to the state crime of felon in possession of a firearm. See Blom, 242 F.3d at 808 ("A state police officer who knew Blom was a convicted felon . . . would surely know that possession of ammunition is 'linked' to the state law crime of possessing a firearm."); see also Bruce, 109 F.3d at 328-29 (holding that officers lawfully seized shotgun shells, which, while not inherently incriminating,

---

[4]Defendant argues that the above quoted language from Blom flies in the face of the rule that the government must prove that the incriminating nature of the item was immediately apparent to the officer, a burden that cannot be abrogated by speculation as to what the officer may or may not know. But there is no speculation here as to what Decker knew as a factual matter; he knew defendant was a felon, and he found bullets among defendant's belongings. What these facts amount to under the Fourth Amendment is determined objectively; Decker's subjective knowledge of federal law matters not.

in connection with the crime being investigated took on a suspicious nature giving the officers probable cause to seize them).[5] In United States v. Cooper, 19 F.3d 1154, 1163 (7th Cir.1994), the court found the incriminating nature of an empty ammunition box immediately apparent under this rationale. The court found the possession of ammunition probative of weapon possession, and the fact that the box was empty raised an inference that the contents had been used in a firearm. Id. The detective who conducted the search knew that the defendant was a convicted felon and thus possessed probable cause to believe that the defendant had violated federal and state law by possessing a firearm; "the ammunition box was probative of this violation." Id.; see also United States v. Kiner, No. 3:10-CR-00087, 2011 WL 98563, at *3-4 (N.D. Ind. Jan. 12, 2011) (relying on Blom and Kiner to deny motion to suppress).

Defendant argues that even if Decker could have lawfully seized ammunition observed in plain view, here Decker saw boxes purporting to contain bullets; he did not see actual bullets. Only after he opened the boxes did Decker know what they held. See Arizona v. Hicks, 480 U.S. 321, 325 (1987) ("[T]aking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry.").

It is true that, ordinarily, the police must obtain a warrant before opening a closed container because, by concealing the contents from plain view, the possessor creates a

---

[5]Defendant argues that Bruce and Blom are distinguishable because in those cases the bullets seized bore a direct relationship to the crimes under investigation. In this case, defendant argues, the boxes of ammunition did not point to some incriminating aspect of his then-suspected crime of failing to register as a sex offender. However, defendant again places too much weight on Decker's subjective motives.

reasonable expectation of privacy. United States v. Banks, 514 F.3d 769, 773 (8th Cir. 2008).

"However, like objects that sit out in the open, the contents of some containers are treated

similarly to objects in plain view." Id. Courts have held that containers which permit one to

infer their contents based on their outward appearance are not entitled to full Fourth

Amendment protection. Id. (citing Arkansas v. Sanders, 442 U.S. 753, 764-65 n.13 (1979)

("Not all containers and packages found by police during the course of a search will deserve

the full protection of the Fourth Amendment. Thus, some containers (for example a kit of

burglar tools or a gun case) by their very nature cannot support any reasonable expectation of

privacy because their contents can be inferred from their outward appearance."), overruled on

other grounds by California v. Acevedo, 500 U.S. 565 (1991)); United States v. Meada, 408

F.3d 14, 23 (1st Cir. 2005) (collecting cases holding that containers which betray their contents

are treated as being in plain view); United States v. Miller, 929 F.2d 364, 364-65 (8th Cir. 1991)

(holding that no warrant was required to search a bag whose size and shape suggested it

contained a gun). Individuals possess a lesser expectation of privacy in the contents of such

containers when the container is observed from a lawful vantage point. Banks, 514 F.3d at

774.

For instance, in United States v. Eschweiler, 745 F.2d 435, 439 (7th Cir. 1984), agents

executing a search warrant for drugs and money searched an overcoat, locating a small

envelope for a safe-deposit box key in one of the pockets. The agent opened the envelope,

which said "safe-deposit box key" and had the name of the bank on it, and took out the key.

Based in part on the envelope and key, the government got a warrant to search the safe

deposit box, which contained cocaine and money. The defendant argued that the search of

the envelope and the seizure of the key violated his rights under the Fourth Amendment, and

that the evidence seized from the safe-deposit box should have been suppressed as the fruit

of the violation. The court held that the agents found the envelope in plain view and therefore

could lawfully seize it without a warrant. Id. The court further rejected the defendant's

argument that the agents could not open the envelope, noting that:

> a container that proclaims its contents on the outside is not a private place. This point would be obvious if the envelope had been transparent; then its contents would have been literally in plain view. The inscription and other characteristics that unequivocally revealed its contents made it transparent in the contemplation of the law.

Id. at 440; see also United States v. Terry, 702 F.2d 299, 319 (2d Cir. 1983) (holding that agent

properly seized and opened a box containing a drug scale "since the outside of the box itself,

which was in plain view, bore the name 'OHAUS,' the name of a balance scale frequently used

in narcotics dealing, and the open box revealed part of the scale with white powder residue on

it").[6]

In the present case, the boxes Decker saw proclaimed their contents – Remington

ammunition. While it might be theoretically possible that the boxes contained something else,

---

[6]Defendant relies on dicta in United States v. Goins, 437 F.3d 644, 649-50 (7th Cir. 2006), but that case is inapposite. There, the defendant's girlfriend consented to the police entering their apartment to search for a gun. An officer found a gun case, which he opened without a warrant. Because the girlfriend lacked actual or apparent authority to consent to opening the case, it had to fall under some other exception to the exclusionary rule. The district court found the gun admissible under the inevitable discovery doctrine, noting that the officer's discovery of a container that likely contained a gun, which likely belonged to the defendant (a convicted felon), gave the officer probable cause to seize the gun case and its contents until a warrant had been granted. Therefore, the district court ruled that the inevitable discovery doctrine excused the officer's opening the gun case prematurely. Id. at 650. The court of appeals affirmed, noting that absent the officer's "error, we are confident that the gun would eventually have been legally discovered. Exclusion under these circumstances would be inappropriate." Id. (internal citation omitted). It does not appear that anyone argued "plain view" in Goins, much less cited any of the cases discussed in the text involving containers that plainly reveal their contents.

13

there is certainly a reasonable likelihood that they contained bullets. Because ammunition, possessed by a felon, is evidence of a crime, Decker lawfully seized these boxes. See Banks, 514 F.3d at 775-76.[7]

### 2. Defendant's Objection

Because the incriminating nature of the ammunition was immediately apparent, I must decide whether Decker was "lawfully present" in the spot from which he observed the boxes. For reasons both legal and factual, I also agree with the government on this issue.

First, I agree with the magistrate judge that Decker saw the ammunition before he obtained a stool. Decker testified that he may have used a stool at some point, but he did not use a stool to initially spot the ammunition. When testifying in more narrative form on direct examination, Warren likewise said that Decker first saw the bullets and then obtained the stool, which he used to pull down the bag containing the firearms. While it is true that Warren said the converse in response to a series of leading questions on cross-examination, her testimony on direct seems more reliable. Finally, the photographs admitted in evidence show that the 6'1" Decker could have easily seen the bullets, which were located near the edge of the second shelf from the top (Govt. Ex. A), without a stool, so there would be no reason why he would have obtained one at that point of his investigation (as opposed to later, when he started pulling things down off the shelves).

Defendant argues that, at best, the evidence is at equipoise, resulting in a loss for the government, which bears the burden on this issue. See State v. Evans, 944 P.2d 1120, 1126 (Wyo. 1997) ("Because the prosecutor had the burden of proof, evidentiary equipoise

_____

[7]Given their presence among defendant's belongings, Decker could reasonably assume that the boxes of ammunition belonged to defendant.

necessitated the court's ruling that the prosecutor had failed in his burden of proof."). But the presence of uncertainty in the record does not require a trial judge to throw up his hands and simply rule against the party that bears the burden. Given Decker's testimony, Warren's testimony when speaking in her own words, and the location of the ammunition, I find it more likely than not that Decker saw the ammunition before he got a stool.

Second, even if Decker used a stool to observe and photograph the ammunition, I cannot conclude that this exceeded the scope of Warren's consent. While a person's failure to object should not be construed as expanding the scope of consent, the court may properly consider silence in understanding what it is she allowed the police to do. Thus, while I agree with the magistrate judge that Warren's acquiescence to Decker's looking through the gray bag cannot bring that search within the ambit of her consent, her apparent agreement in Decker's use of a stool to photograph the bedroom is something else. Indeed, it appears that Warren may have fetched the stool for Decker, which suggests that she did not see this as outside the scope of what she agreed he could do.

Moreover, it is hard to see how using a stool to better photograph the contents of the shelves expanded the scope of consent. As the government notes, this cannot be meaningfully distinguished from other tactics Decker might have used to facilitate his view, such as standing on tip-toe, or using a flash or telephoto lens. And, because the bullets clearly could have been viewed from a position standing on the floor (Govt. Ex. A, Def. Ex. 100), it is hard to see how using a stool to see or photograph them more clearly resulted in an additional invasion of privacy. In sum, I find that even if Decker used a stool to see the ammunition, he was still within the scope of Warren's consent and thus "lawfully present" for purposes of plain view analysis.

15

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation is adopted in part, and defendant's motion to suppress (R. 12) is **GRANTED IN PART** and **DENIED IN PART**, as stated herein.

**IT IS FURTHER ORDERED** that defendant's motion to sever counts (R. 11) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 7th day of February, 2012.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge